TATTNALL COUNTY
CLERK OF SUPERIOR

RECEIPT NUMBER: 168338          2/16/2022
                                    14:55

NAME: PEACHCOURT

TRANSACTION TYPE          R/C     AMOUNT

          GENERAL FUND (1)

                           R      $211.00
CIVIL FILING FEES-STATE
   ST-2022-SV-13-PL-1-PEACHCOURT


          TOTAL DUE:              $211.00

| CHECK # | AMOUNT |
|---------|--------|
| -1 | $211.00 |
| TOTAL PAYMENT: | $211.00 |

          BALANCE:                $0.00

OP:  GENA HUTCHESON

**IN THE STATE COURT OF TATTNALL COUNTY**

**STATE OF GEORGIA**

⊕ EFILED IN OFFICE
CLERK OF STATE COURT
TATTNALL COUNTY, GEORGIA

**STSV2022000013**
HM
FEB 16, 2022 12:44 PM

*Paige D. Mulligan*
Paige D. Mulligan, Clerk
Tattnall County, Georgia

| | | |
|---|---|---|
| PAUL ADAMS and CHRISTINE ADAMS, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| v. | ) | |
| | ) | FILE NO.:_____ |
| TATTNALL COUNTY; JOHN DOE #1; | ) | |
| JOHN DOE #2; and JOHN DOE #3, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COME NOW the Plaintiffs, through their undersigned attorney, and file this Complaint against Defendants and show the Court as follows:

### Preliminary, Venue, And Jurisdiction Allegations

1.

Plaintiffs are husband and wife who are residents of Tattnall County. They bring this action to recover for injuries and damages proximately caused by the tortious conduct of Defendants.

2.

Defendant Tattnall County is subject to the jurisdiction and venue of this Court and may be served through its Chairman of the Board Of Commissioners pursuant to O.C.G.A. §9-11-4(e)(5). The Chairman of the Board Of Commissioners is listed as Jackie C. Trim and may be served at 108 West Brazell Street, Reidsville, Tattnall County, Georgia 30453-0025. A copy of this website page is attached hereto as "Exhibit A" and is incorporated herein by reference. The internet link is: https://www.tattnallcountyga.com/board-of-commissioners.cfm .

3.

Defendants John Doe Nos. 1-3 are parties whose names are not known at this time. These persons may be designated by the name John Doe and when these parties' true names are discovered, this Complaint may be amended accordingly pursuant to O.C.G.A. §9-11-10(a): "A party whose name is not known may be designated by any name; and, when his true name is discovered, the pleading may be amended accordingly."

## **Factual Background**

4.

Defendant Tattnall County's Emergency Medical Services ("EMS") received a 911 emergency call from the residence of Plaintiffs on January 25, 2021.

5.

Plaintiff Christine Adams (hereinafter referred to as "Mrs. Adams") requested emergency care and ambulance transport for her husband, to-wit: Plaintiff Paul Adams.

6.

Mrs. Adams had been instructed by her husband's healthcare provider to call an ambulance.

7.

Plaintiff Paul Adams (hereinafter referred to as "Mr. Adams") was suffering from severe bilateral pneumonia; had great difficulty breathing; was running low on oxygen in his oxygen tank; was vomiting; and was crying out in pain.

8.

Mrs. Adams requested that her husband receive emergency care and be taken to Memorial Medical Center Hospital in Savannah where his immediate admission to the hospital had been arranged in advance.

9.

Although an ambulance from Tattnall County was dispatched and it arrived at the Adams home, Defendants refused to assess, evaluate, and stabilize Mr. Adams.

10.

Defendants refused to take Mr. Adams to the hospital in the ambulance.

11.

Defendants remained outside the Adams' home for approximately forty-five (45) minutes.  During this time, the Defendants' only actions were involved with trying to get Mrs. Adams to sign a form which is believed to be a county medical release and/or a form which declines emergency care and transport for her husband.

12.

Mrs. Adams was very upset and crying due to the dire condition of her husband. Despite Mrs. Adams' emotional condition and the known emergency status of her husband, Defendants denied county emergency services to Mr. Adams.

13.

Defendants stated they would not help Mr. Adams, nor would they take him to the hospital.  Instead, they pressured Mrs. Adams to sign a paper. She finally signed this paper under duress. She was not given a copy of the paper she was coerced to sign.

14.

Upon information and belief, it is believed Defendants have three ambulance stations in Tattnall County, with each emergency station providing a county ambulance to residents of Tattnall County.

15.

Upon information and belief, it is believed the three EMS stations with county ambulances are located in Reidsville, Georgia; Glennville, Georgia; and Collins, Georgia.

16.

In the event there are too few available ambulances, state-wide regulations require Defendants to request EMS help from adjoining counties. Tattnall County itself provides EMS mutual aid to surrounding counties in the event another county temporarily requires more ambulances.  See Exhibit "B", at the top, second sentence.

17.

Although it was a long and harrowing trip, fortunately Mr. Adams survived the trip to the hospital which was approximately sixty-five (65) miles away.

18.

Because Defendants refused to take the ill Mr. Adams in an ambulance, Mrs. Adams was forced to drive him in their family car.

19.

Mr. Adams was immediately treated in Memorial Hospital's emergency department and then was placed in the hospital's intensive care unit for a week.  This was followed by a long convalescence at his home.

20.

Mr. Adams' emergency room doctor stated Mr. Adams was in a more critical condition than the doctor's other seventy-six (76) patients in the emergency room's waiting rooms.

21.

Mr. Adams' healthcare provider for many years has been a certified nurse practitioner named Sherry May, NP-C.

22.

Sherry May states in a letter dated March 9, 2021 that on January 25, 2021, Mr. Adams was in a serious condition and he had previously been to her office that day.

23.

After Mr. Adams left her office, she saw the results of tests which showed Mr. Adams' serious condition. She called Mrs. Adams and said Mr. Adams needed to immediately get to a hospital, and they should call an ambulance. A copy of this letter is attached hereto as Exhibit "C" and incorporated herein by reference.

24.

Ms. May also says in her letter that she had spoken with Memorial Hospital and they agreed to admit Mr. Adams. Other hospitals were full and unable to admit Mr. Adams.

25.

Exhibit "C" says that Mr. Adams' condition was hypoxemia, which is an abnormally low concentration of oxygen in the blood.

26.

Ms. May also told Mrs. Adams by telephone on January 25, 2021 that her husband was at risk of imminent heart failure due to lack of sufficient blood oxygen.

27.

Tattnall County's EMS is licensed by the Georgia Department of Human Resources and provides primary 911 EMS service. https://www.tattnallcountyga.com/emergency-medical-service.cfm.  A copy of this website page is attached hereto as Exhibit "B" and is incorporated herein by reference.

28.

Defendant Tattnall County's website describes the many functions of its county EMS services at https://www.tattnallcountyga.com/emergency-medical-service.cfm (Exhibit "B").

29.

As shown on Exhibit "B", Tattnall County routinely provides ambulance transport to Memorial Hospital in Savannah, Georgia.  See the third paragraph of Exhibit "B".

30.

Nevertheless, ambulance service to Memorial Hospital was flatly denied to Mr. Adams.

31.

When the ambulance arrived at the Adams' home, Defendants told Mrs. Adams they would not go into the house; asked her to bring Mr. Adams outside; did not evaluate Mr. Adams; and stated they had been instructed not to take Mr. Adams to the hospital.

32.

Defendants told Mrs. Adams they would not treat or transport her husband and she needed to sign a paper.

33.

Defendants told Mrs. Adams she, as his wife, was responsible for taking her husband to the hospital and she was responsible for his medical care.

34.

Mrs. Adams understood that she could not leave with her husband to go to the hospital until she signed Defendants' paper.

35.

Mrs. Adams was distraught and sobbing with panic and grief over her husband's dire condition. Among other things, Mr. Adams was having great difficulty breathing.

36.

Mrs. Adams initially refused to sign the paper, but after a lengthy delay she relented and signed it so she could get her critical husband to the hospital in her own car.

37.

Defendants' ambulance sat outside the Adams' home for approximately forty-five (45) minutes while Defendants refused to evaluate and treat her husband, and also refused to enter the Adams' home.

38.

One of the Defendants finally entered the home after the county paper was signed. Mrs. Adams told Defendants she would take her husband to the hospital in her own car, but she was unable to get him out of the bed.

39.

One of the Defendants helped Mr. Adams sit up in his bed, but did not help him to the family car.

40.

Neighbors and a City of Reidsville employee observed the ambulance at the Adams' home for forty-five (45) minutes, as well as the distraught condition of Mrs. Adams outside her home while pleading with the Defendants to take care of her husband. They

also observed a very ill Mr. Adams screaming in pain outside the home as he was getting to the family car.

41.

When he arrived at the hospital, Mr. Adams presented with hypoxia, shortness of breath, labored breathing, and worsening overall symptoms.

42.

An x-ray showed bilateral pneumonia/pneumonitis (page 11).

43.

Memorial Hospital's physician wrote that Mr. Adams must be admitted to the hospital and must be monitored very closely due to high concern for respiratory collapse (page 12).

44.

Since Mr. Adams presented with hypoxemic respiratory failure, he required high flow oxygen concentration of 80% (page 12). In an emergency, high flow oxygen is used as an alternative for more invasive forms of treatment such as mechanical ventilation. Later, his condition was identified as acute hypoxemic respiratory distress (page 63).

45.

Mr. Adams also had a high white blood cell count and he was placed on steroids. He was immediately transferred to the intensive care unit (page 12).

46.

Dr. Steven E. Goldberg at Memorial Hospital's emergency room noted on page 25 of the hospital records, middle paragraph, and at the top of page 35, that Mr. Adams was not transported by ambulance and that Mr. Adams "had to travel here by car and he was not sure he was going to make it".

47.

Two days after hospital admission, Dr. Christopher R. Curro writes on page 56 of the hospital records that Mr. Adams was weaned off high-flow oxygen to treat acute respiratory distress, and was then stabilized on low-flow oxygen support.

48.

Mr. Adams required emergency high flow oxygen support of 80% upon his emergency arrival at Memorial Hospital and this was utilized until the second day at the hospital.

49.

Hospital clinical notes state Mr. Adams was at high risk for rapid deterioration, required high flow oxygen, and he had suspected viral sepsis (page 61).

50.

On page 63 of the hospital records, Mr. Adams is shown to have been assessed with acute hypoxemic respiratory failure, along with other medical conditions.

## COUNT ONE
## Personal Injury

51.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 50 as if set forth fully herein.

52.

The unlawful tortious conduct of Defendants exacerbated and caused the aggravation of Mr. Adams' serious medical condition.

53.

Defendants are tortfeasors who deliberately, cruelly, intentionally, and with malice, caused Mr. Adams' personal injuries.

54.

Defendants are tortfeasors who negligently caused Mr. Adams' personal injuries.

55.

Defendants are tortfeasors who were grossly negligent and caused Mr. Adams' personal injuries.

56.

The wrongdoing of Defendants proximately caused unnecessary physical pain and suffering.

57.

The wrongdoing of Defendants also proximately caused severe emotional distress to Mr. Adams.

58.

Emotional distress is a type of pain and suffering which is recognized in Georgia as a compensable damage along with physical pain and suffering.

59.

Mr. Adams unnecessarily suffered physically and mentally while Defendants' ambulance sat at outside his residence for forty-five (45) minutes refusing to evaluate and treat him.

60.

Mr. Adams suffered for another unnecessary prolonged period due to Defendants' refusal of emergency transport. Instead, his wife had to drive him in the family car and this trip took longer than a trip by ambulance.

61.

The family car driven by Mrs. Adams had no trained EMS personnel inside, nor did it have any advanced life support equipment which would have stabilized Mr. Adams' critical condition, eased his suffering, and reduced his emotional distress.

62.

Because he was refused ambulance transport, Mr. Adams' arrival at the hospital was further delayed. Mrs. Adams had to place him in a wheelchair from her car, and then she had to push him to the emergency department's entrance and waiting room.

63.

When the Adams' got to the hospital, Mr. Adams could not walk. He required a wheelchair.

64.

When the Adams' got to the hospital, Mr. Adams could not hold his head up. He clearly had required life support, emergency care, and emergency transport. Defendants denied all of these things to Mr. Adams.

65.

Personnel at the hospital were incredulous that his wife had been required to bring Mr. Adams in her own car and he had not arrived by ambulance.

66.

Due to Defendants' wrongdoing during all of these delays in care and treatment, Mr. Adams' medical condition deteriorated and he suffered great physical pain and great emotional distress.

67.

Mr. Adams feared his impending death due to Defendants' refusal of emergency care and transport.

68.

Mr. Adams' condition was worsening by the minute while the ambulance sat outside his home.

69.

Mr. Adams' condition was worsening by the minute while waiting in the family home and in the family car during the long ride to the hospital.

70.

Mr. Adams' condition was worsening by the minute while being placed in a wheelchair by his wife at the hospital and being wheeled into the emergency room.

71.

O.C.G.A. §46-5-131(a) states that Defendants carrying out duties through a 911 emergency telephone system cannot be held liable "except in cases of wanton and willful misconduct or bad faith". Defendants' acts and omissions show wanton and willful misconduct, as well as bad faith.

72.

Wanton misconduct in Georgia is defined as "that which is so reckless or so charged with indifference to the consequences as to justify the jury in finding a wantonness equivalent in spirit to actual intent ...". (Citation and punctuation omitted.) Dyches v. McCorkle, 212 Ga. App. 209, 217(2), 441 S.E.2d 518 (1994).

73.

Willful misconduct is defined in Georgia as conduct which "is based on an actual intention to do harm or inflict injury". (Citation and punctuation omitted.) Dyches v. McCorkle, 212 Ga. App. 209, 217(2), 441 S.E.2d 518 (1994).

74.

Bad faith is defined in Georgia as "not simply bad judgment or negligence, but it imports a dishonest purpose or some moral obliquity, and implies conscious doing of wrong, and means breach of [a] known duty through some motive of interest or ill will". (Citation and punctuation omitted.) Id. at 216(2), 441 S.E.2d 518.

## COUNT TWO

### Intentional Inflection Of Emotional Distress

75.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 74 as if set forth fully herein.

76.

Due to Defendants' intentional infliction of emotional distress, both Plaintiffs suffered severe mental harm.

77.

Mr. Adams knew his body was hypoxic and it was worsening by the minute. He was severely harmed by Defendants' refusal to evaluate, treat, and transport him with ambulance life support equipment. He feared he would not live long enough to be admitted to Memorial Hospital.

78.

Mrs. Adams knew her husband was in a critical condition and she was severely harmed by Defendants' refusal to evaluate, treat, and transport her husband.

79.

She feared her husband would not live long enough to be admitted to Memorial Hospital yet she was forced to drive over 60 miles with her critical husband in the car.

80.

Mrs. Adams was crying and pleading with the Defendants to please help her husband. Defendants ignored her appeals and just insisted she sign some county paper.

81.

Defendants even told Mrs. Adams she should call another 911 system if Mr. Adams got worse during the car trip. "If you get in trouble on the road", they said, "call 911."

82.

Defendants knew the distance to Memorial Hospital was over sixty (60) miles and yet they required Mrs. Adams to drive her critical husband without any medical or emergency support.

83.

Plaintiffs' mental suffering was known to Defendants.

84.

Defendants watched the critical Mr. Adams enter his family car while he was crying out in severe pain.  Defendants watched the sobbing and panicked wife begin the long journey with her critical husband sitting in the car.

85.

Defendants were cruel, had intentional misconduct, and their actions were done with malice.

86.

Defendants' acts and omissions were done with an entire want of care and a conscious indifference to consequences.

87.

Defendants were wanton, their actions were done with willful misconduct, and their wrongdoing constituted bad faith.

88.

O.C.G.A. §46-5-131(a) says that Defendants carrying out duties through a 911 emergency telephone system cannot be held liable "except in cases of wanton and willful misconduct or bad faith". Dyches, *supra*, 216(2), 217(2).

## COUNT THREE

### Violation Of Laws And Regulations Through
### Negligence, Gross Negligence, And Intentional Misconduct

89.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 88 as if set forth fully herein.

90.

Defendants refused to provide emergency evaluation, medical care, and transport to Mr. Adams after arriving at the family home.

91.

Defendants abandoned a critical emergency patient and refused to accommodate his disabilities.

92.

Defendants' violations were done through negligence, gross negligence, and bad faith. Defendants' wrongful conduct was intentional, willful, and actions were done with malice.

93.

Defendants' wrongdoing violated federal laws, federal regulations, state laws, and state regulations.

94.

Mr. Adams is a disabled person. Defendants' wrongdoing violated the Americans With Disabilities Act (ADA), 42 USC §12101 et seq., and 28 CFR Sec. 35.101.

95.

Georgia's requirements for Emergency Medical Evaluation and stabilization is outlined by statute, in O.C.G.A. §31-11-82, as follows:

**Universal Citation:** GA Code §31-11-82 (2019)

(a) **Once a person with an emergency condition presents himself or herself to an emergency medical provider for emergency services, that person shall be evaluated by medical personnel.** This evaluation may include diagnostic testing to assess the extent of the condition, sickness, or injury if such testing is appropriate to stabilize the patient's condition. ... (Emphasis added.)

96.

An emergency medical provider is defined in O.C.G.A. §31-11-81 as "any provider of emergency medical transportation licensed or permitted by the Department of Public Health ...".

97.

An emergency condition is defined in O.C.G.A. §31-11-81 as any medical condition of a recent onset and severity, including, but not limited to, pain that would lead a prudent layperson to believe that the condition without immediate medical care could place health in serious jeopardy, seriously impair bodily functions, or would cause serious dysfunction of a bodily organ or body part. Mr. Adams' condition meets this definition.

98.

Mr. Adams' medical status met the definition of an emergency condition at the relevant time.

99.

Mr. Adams had an emergency condition and he was presented to Defendants who were emergency medical providers. O.C.G.A. §31-11-82 requires emergency medical personnel to evaluate and stabilize this patient. This statute was violated.

100.

Georgia's EMS Administrative code was also violated by Defendants. It states all emergency medical services shall meet standards of conduct, which include: Rule 511-9-2-.18 ... (22) A licensee shall take no action that would jeopardize the health or safety of a patient, including without limitation the abandonment or mistreatment of a patient...; 30) A licensee shall not violate any lawful order of the Department; and (31) A licensee shall not violate any statute or regulation, state or federal, which pertains to Emergency Medical Services (emphasis added).

101.

Violation of laws and regulations establish bad faith. Bad faith is shown by the breach of known duties. Vickers v. Motte, 109 Ga. App. 615, 619-620, 137 S.E.2d 77 (1964). Vickers is cited and followed by the Georgia Supreme Court in Lathrop v. Deal, 801 S.E.2d 867, 886, 302 Ga. 408 (2017).

102.

In violation of Rule 511-9-2-.18, Mr. Adams' life was endangered by the Defendants' delay and inaction.

103.

In violation of Rule 511-9-2-.18, Mr. Adams was mistreated and abandoned by Defendants. His health and his life were put in serious jeopardy by Defendants' wrongdoing.

104.

EMS Rule 51-9-2-.09(6)(d) was also violated by Defendants.  It requires sufficient licensed personnel to be immediately available to respond with at least one registered medical first responder vehicle. If they are not available, according to this state-wide regulation, they shall request mutual aid assistance and if mutual aid is not available, the EMS provider shall respond with its next available registered vehicle.

105.

Defendants violated EMS Rule 51-9-2-.09(6)(d).

106.

EMS Rule 51-9-2-.09(6)(g) was also violated by Defendants. It states that control of patient care at the scene of an emergency (Mr. Adams' home) shall be the responsibility of the individual in attendance most appropriately trained and knowledgeable in providing prehospital emergency care and transportation. Defendants refused medical care to Mr. Adams and tried for forty-five (45) minutes to coerce Mrs. Adams into taking control of her husband's medical care. She finally relented so she could get Mr. Adams to the hospital herself.

107.

Defendants used coercion and pressured a distressed, sobbing wife to sign some paper supposedly declining county emergency services and making her responsible for her husband's care and transport.  This was done while she was in distress, feared for her husband's life, and Defendants refused to take control of patient care.

108.

Defendants' actions also violated Rule 511-9-2-.09(6)(h) which prohibits Defendants from misrepresenting or falsifying any information on forms filed with the department. A form signed under duress, and which was not done with Mrs. Adams' free will, contains misrepresentations and false information.

109.

Rule 511-9-2-.07(6)(k) was also violated by Defendants. It requires emergency transport to the hospital chosen by a patient if the hospital is capable of meeting the patient's immediate needs, is a reasonable distance, and the hospital is in the usual and customary transport area. All of these criteria were met on January 25, 2021, but the Defendants violated this regulation.

110.

If a patient insists on being transported to his chosen hospital, and it is within a reasonable distance, then Rule 511-9-2-.07(6)(k)(l) states that a patient shall be transported to that hospital. As shown on Exhibit "B", third paragraph, Tattnall County's own EMS website says its ambulances regularly take patients to Memorial Hospital in Savannah, yet this was refused to Mr. Adams.

111.

Further, Rule 511-9-2-.07(6)(k)(l) again states that ambulance providers shall not misrepresent or falsify any information on forms filed with the department or completed as a result of an ambulance response. Mrs. Adams' coerced signature on a county paperwork form is a misrepresentation.

## COUNT FOUR
### **County Paper Signed By Mrs. Adams Is Void**

112.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 111 as if set forth fully herein.

113.

Defendants' paper was signed by Mrs. Adams in her front yard. Her signature on this paper was obtained solely through coercion and undue pressure while she was in a dire emotional state and feared the imminent death of her husband.

114.

The Defendants' paper signed by Mrs. Adams on January 25, 2021 is void and unenforceable. Tidwell v. Critz, 248 Ga. 201, 203, 282 S.E.2d 104 (1981) (Georgia Supreme Court - duress consists of threats of bodily or other harm, or other means of pressure on the will of another, and inducing one to do an act contrary to free will, and such coercion is sufficient to overcome the mind and will of a person of ordinary firmness.).

115.

Egregious conduct or threats void an agreement which is then signed under duress. Rowles v. Rowles, 830 S.E.2d 589, 596 (2019). Defendants' actions on January 25, 2021 constituted egregious conduct.

116.

There was no quid pro quo between the parties allowing the enforcement of a paper signed by Mrs. Adams. It is believed the Defendants' paper stated Mrs. Adams was declining county services, was refusing transport for her husband, and that she was then responsible for the medical care and transportation of her husband.

117.

Although the Defendants had the duty to care for and transport her husband, under duress Mrs. Adams only agreed to putatively shoulder these county responsibilities because of undue pressure upon her. She received nothing in return for assuming the Defendants' duties which were owed to her husband.

## COUNT FIVE

### Gross Negligence, Willful And Wanton
### <u>Wrongdoing Done With Malice And Bad Faith</u>

118.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 117 as if set forth fully herein.

119.

The Defendants' wrongdoing was grossly negligent and done with an entire want of care and a conscious indifference to consequences.

120.

No ambulance was provided for emergency transport to Memorial Hospital in Savannah, although the ambulance sat at the Adams' home for forty-five (45) minutes with two emergency personnel outside the home doing nothing.

121.

Although Defendants knew of Mr. Adams' dire condition, emergency medical evaluation and treatment was refused to him, and Defendants also refused to enter the Adams' home until Mrs. Adams signed a paper.

122.

Defendants were advised of Mr. Adams' critical condition.

123.

Despite their knowledge and recognition of his dire condition, Defendants refused emergency care and ambulance transport.

124.

O.C.G.A. §46-5-131(a) provides that Defendants who are carrying out duties involved in operating a 911 emergency telephone system cannot be held liable "except in cases of wanton and willful misconduct or bad faith".

125.

Defendants conduct on January 25, 2021 was wanton and willful misconduct, and showed bad faith.

## COUNT SIX
## Americans With Disabilities Act Violations

### Intentional Discrimination And Deliberate
### Indifference To Rights And/Or Actual Malice

126.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 125 as if set forth fully herein.

127.

Defendants violated the Americans With Disabilities Act (ADA), 42 USC §12101 et seq.

128.

Title II of the ADA provides "no individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs or activities of a public entity, or be subject to discrimination by any such entity".

129.

Mr. Adams was discriminated against and denied county benefits, services and programs. The federal government's ADA website states:

### State and Local Governments (Title II)

Title II applies to state and local government entities, and, in subtitle A, protects qualified individuals with disabilities from discrimination on the basis of disability in services, programs, and activities provided by State and local government entities.

130.

Where there is a violation of the United States' American with Disabilities Act, there is no county sovereign immunity from damage lawsuits.

131.

The federal ADA requirements apply to Defendants' local government programs and activities.

132.

Discriminatory behavior and failure to accommodate those with disabilities will subject Defendants to lawsuits by private individuals.

133.

Mr. Adams' permanent disability and severe temporary incapacity was required to be accommodated by Defendants, and this was not done.

134.

The Defendants' actions on January 25, 2021 demonstrate prima facie discrimination against a disabled individual.

135.

Title II of the ADA prohibits discrimination by Defendants on the basis of disability in local government programs and services.

136.

Compensatory damages are available in a lawsuit under Title II.

137.

Attorneys' fee awards based upon an ADA violation are at the discretion of the court.

138.

ADA compensatory damages are available since the discrimination by Defendants was intentional.

139.

According to the ADA, intentional discrimination means conduct which results from deliberate indifference to the rights of the individual or actual malice.

140.

The Defendants' discrimination and failure to accommodate Mr. Adams' disabilities was intentional and the Defendants' actions constituted deliberate indifference and/or malice toward the Plaintiffs.

141.

This lawsuit allows an award of compensatory damages, as well as the right to claim legal fees for the ADA violations.

142.

Defendants do not have the United States Constitution's Eleventh Amendment immunity since the wrongdoing stems from county services, unlike State of Georgia actions. The Eleventh Amendment has been interpreted to mean that state courts will not hear certain suits against a state if those suits are based on federal laws.

143.

Mr. Adams was confined to his bed on January 25, 2021. Upon their arrival at the Adams' home, the Defendants were told he was confined to his bed, but Defendants discriminated against him and refused to enter the home to assist and evaluate his medical condition.

144.

Defendants discriminated against Mr. Adams by denying him emergency medical care, stabilization, and transport.

145.

Defendants discriminated against Mr. Adams by requiring Mrs. Adams to first sign a county paper before Defendants would enter the home to help Mr. Adams sit up in his bed.

146.

Defendants' discrimination caused a substantial delay in critical care for Mr. Adams, resulting in injuries and damages, and severe emotional distress to both Plaintiffs.

147.

Although the ADA requires Defendants to accommodate the incapacities of a disabled individual, the Defendants provided no such accommodations. Defendants refused care and transport altogether. Defendants refused all services outlined in its website as shown on Exhibit "B" attached hereto and incorporated herein by reference.

148.

An ADA lawsuit will be dismissed only if the complaint discloses with certainty that the plaintiff would not be entitled to relief under any state of provable facts. Raza v. Swiss Supply, 256 Ga. App, 175, 178, 568 S.E.2d 102 (2002) and Williamson v. Department of Human Resources, 572 S.E.2d 678, 680, 682, 258 Ga App. 113 (2002) (ADA claim allowed to proceed against government agency).

149.

In 2008, the United States Social Security Administration found Mr. Adams to be a permanently disabled individual since the year 2002.

150.

Mr. Adams' long term disability at times made him unable to get out of his bed.

151.

On January 25, 2021, Mr. Adams could not get out of his bed. He was also in other physical distress, had pronounced pain with nausea and vomiting, and he had great difficulty breathing.

152.

The United States Code of Federal Regulations states the definition of "disability" shall be construed broadly in favor of expansive coverage, and "the question of whether an individual meets the definition of disability under this part should not demand extensive analysis". 28 CFR Sec. 35.101. This section also provides in paragraph (b) as follows:

> **"(b) Broad coverage.** The primary purpose of the ADA Amendments Act is to make it easier for people with disabilities to obtain protection under the ADA. ...the definition of 'disability' in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. **The primary object of attention in cases is ... not whether the individual meets the definition of disability.** The question of whether an individual meets the definition of 'disability' ... should not demand extensive analysis." (Emphasis added.)

153.

The ADA defines a disability as an impairment that substantially affects major life activities. This includes the ability to breathe and other major bodily functions.

154.

Even short-term illnesses, if severe, constitute a disability. Even though conditions may be temporary, their consequences and effect on major life activities can be severe and, thus, Mr. Adams' short term medical condition is a recognized disability under the ADA.

155.

Mr. Adams was suffering from both a long-term disability since 2002 and a severe temporary disability due to a serious illness. These conditions affected his ability to breathe, perform major bodily functions, and restricted major life activities.

156.

Mr. Adams meets the definition of a qualified disabled individual in two different areas for purposes of the ADA.

157.

Local county governments cannot use sovereign immunity as a shield when ADA violations are alleged. Newman v. Johnson, 733 S.E.2d 520 (2012) (ADA claim for monetary damages based upon injuries when someone fell on a step near entrance to a Bryan County building. However, the plaintiff admitted she was not disabled and, therefore, no ADA claim was allowed.). Unlike in Newman v. Johnson, Mr. Adams is a disabled individual who was discriminated against by Defendants in violation of the ADA.

158.

In Kesterson v. Jarrett, 728 S.E.2d 557, 291 Ga. 380 (2012), the Georgia Supreme Court, in footnote 8, recognizes the validity of an ADA lawsuit against a county for discrimination.

159.

In Matter of John Anthony Montesanti, 818 S.E.2d 585, 588-589, 302 Ga. 380 (2018), the Georgia Supreme Court finds Title II of ADA protects qualified individuals with disabilities from discrimination in services, programs, and activities pursuant to 42 USCA § 12132.

## COUNT SEVEN
### <u>Lack Of Good Faith Emergency Care</u>

160.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 159 as if set forth fully herein.

161.

O.C.G.A. §31-11-8 covers liability for rendering emergency care. If a county receives no remuneration and provides emergency care in good faith, there is no liability.

162.

If a county only receives remuneration for the purpose of defraying administrative costs. this is considered no remuneration.

163.

If Defendants receive remuneration by actual reimbursement for emergency expenses, there is no immunity.

164.

Defendants did not provide emergency medical care in good faith and, therefore, the immunity of O.C.G.A. §31-11-8 does not apply.

165.

In <u>Anderson v. Little</u>, 242 Ga. 751, 754-755 (2), 251 S.E.2d 250 (1978), the Georgia Supreme Court states, "The statute is carefully drawn so as to grant immunity to providers of ambulance service only for their acts and omissions in rendering such emergency care."

166.

The Georgia Supreme Court defines good faith as "a state of mind indicating honesty and lawfulness of purpose; belief that one's conduct is not unconscionable or that known circumstances do not require further investigation". <u>Anderson v. Little</u>, 242 Ga. 751, 753(1), 251 S.E.2d 250 (1978).

167.

The damages sustained by Plaintiffs resulted wholly from Defendants' refusal to render emergency care and transport in good faith.

## COUNT EIGHT
### <u>Breach Of Ministerial Duties</u>

168.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 167 as if set forth fully herein.

169.

Defendants violated ministerial duties through violation of controlling laws and regulations through negligence and/or bad faith.

170.

The Georgia Constitution "provides no immunity for ministerial acts negligently performed". <u>Gilbert v. Richardson</u>, 264 Ga. 744, 753 (6), 452 S.E.2d 476 (1994); and "The issue of immunity is a question of law[.]" <u>Pearce v. Tucker</u>, 299 Ga. 224, 227, 787 S.E.2d 749 (2016).

171.

Defendants violated instructions or procedures sufficient "to cause an act to become merely ministerial [and the requirements violated were] ... so clear, definite and certain as merely to require the execution of a relatively simple, specific duty". (Citation and punctuation omitted.) <u>Barnard v. Turner County</u>, 306 Ga. App. 235, 238 (1), 701 S.E.2d 859 (2010).

172.

The violated statutes and regulations are clear descriptions of required simple, specific duties.  These ministerial duties were not performed by Defendants.

173.

Defendants violated established ministerial duties as defined by the Georgia Supreme Court: "A ministerial duty may be established by evidence such as a written policy, an unwritten policy, a supervisor's specific directive, **or a statute.**" (Citations omitted, emphasis added) <u>Roper v. Greenway</u>, 294 Ga. 112, 114-115, 751 S.E.2d 351 (2013).

174.

Defendants do not have official immunity because they negligently performed or failed to perform ministerial duties.  Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d); <u>Teston v. Collins</u>, 217 Ga.App. 829, 459 S.E.2d 452 (1995).

## COUNT NINE
## <u>Breach Of Discretionary Duties</u>

175.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 174 as if set forth fully herein.

176.

Defendants are liable for failure to perform discretionary acts, when discretionary acts are done with actual malice. Actual malice is the intent to cause injury or reckless disregard for human life.

177.

A discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

178.

The Defendants' acts, omissions, and conversations with the Plaintiffs show their intent to injure and the reckless disregard for the life of Mr. Adams who needed emergency care and emergency transport.

179.

This reckless disregard for human life, actual malice, and/or intent to cause injury include, but are not limited to, Defendants telling Mrs. Adams she had to drive her husband in her own car and if she had medical issues during the trip, she should call 911.

180.

Actual malice also means or includes conduct exhibiting a reckless disregard for human life. Merrow v. Hawkins, 266 Ga. 390, 391-392 (2), 467 S.E.2d 336 (1996).

181.

When there is a deliberate intention to do wrong, this constitutes actual malice and this overcomes official immunity. Murphy v. Bajjani, 282 Ga. 197, 203 (4), 647 S.E.2d 54 (2007); Ortega v. Coffey, 824 S.E.2d 690, 694-695, 348 Ga. App. 794 (2019).

182.

Defendants do not have official immunity because they acted with actual malice while performing a discretionary duty. Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d); Teston v. Collins, 217 Ga. App. 829, 459 S.E.2d 452 (1995).

## COUNT TEN

### Litigation Expenses And Attorney's Fees

183.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 182 as if set forth fully herein.

184.

Pursuant to 42 USC § 12205 (ADA) and O.C.G.A. §13-6-11, Plaintiffs are entitled to an award of litigation expenses and attorney's fees.  Forsyth County v. Martin, 610 S.E.2d 512, 517-518, 279 Ga. 215, (2005)

185.

The Georgia Supreme Court in Forsyth v. Martin holds this award is to compensate an injured party for the costs incurred as a result of having to seek legal redress for a legitimate grievance.  Counties are not immune from an award of expenses and fees if the fact-finder finds bad faith, stubbornly litigiousness, or unnecessary trouble and expense. Id., 517 – 518.

## COUNT ELEVEN
## Detrimental Reliance

186.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 185 as if set forth fully herein.

187.

Plaintiffs reasonably relied on promises made by Defendants, and Plaintiffs sustained losses and damages as a result.  O.C.G.A. §13-3-44.

188.

Defendants received an emergency 911 call from Mrs. Adams and she was told an ambulance would be dispatched to the residence.

189.

Plaintiffs waited for the ambulance arrival and waited another forty-five (45) minutes while Defendants refused EMS care and ambulance transport.

190.

Plaintiffs detrimentally relied upon the Defendants' misrepresentations and were damaged as a result.

## COUNT TWELVE
## Fraud

24

191.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 190 as if set forth fully herein.

192.

Defendants made false representations, Defendants knew the representations were false, Defendants induced the Plaintiffs to refrain from taking Mr. Adams to the hospital immediately, and instead waited around for an ambulance which refused service. There was justifiable reliance by Plaintiffs, and resulting damages to Plaintiffs.  O.C.G.A. §51-6-2; <u>Bowden v. Medical Center</u>, 845 S.E.2d 555 (Georgia Supreme Court, 2020), FN 10; <u>Crawford v. Williams</u>, 258 Ga. 806, 806, 365 S.E.2d 223 (1989).

## COUNT THIRTEEN
### Punitive Damages

193.

Plaintiff re-alleges and incorporates by referenced paragraphs 1 through 192 as if set forth fully herein.

194.

Defendants, individually and collectively, maliciously and intentionally, caused Plaintiffs' damages, thereby making an award of punitive damages appropriate.  <u>Everson v. Dekalb County School District</u>, 811 S.E.2d 9, 12-13, 344 GA. App. 665 (2018).

195.

Defendants acted willfully, wantonly, maliciously, and with the intent to harm the Plaintiffs. Id.

### Jury Demand

Pursuant to O.C.G.A. §15–12–122, Plaintiffs demand a full jury panel of twelve (12) to try this case.

WHEREFORE, Plaintiffs pray as follows:

a)      Defendants be served in accordance with the laws of the State of Georgia;

b)      A judgment be issued against Defendants for the full value of all damages sustained by the Plaintiffs in an amount exceeding $225,000.00; and such further amounts as allowed by law, to be determined by a jury as exemplary and punitive damages;

c)      Plaintiffs be awarded attorney's fees and other costs for having to bring this action pursuant to 42 USC 12205, O.C.G.A. §13-6-11, and O.C.G.A. §9-15-14;

d)      For a trial by jury of a panel of twelve (12); and

e)      For such other and further relief as the Court deems fit and proper.


_____

VILLARD S. BASTIEN
Attorney for Plaintiffs
Ga. Bar No. 100176

200 Ashford Center North
Suite 215
Atlanta, Georgia 30338
(404) 378-4344
(470) 275-3906 fax
vbastien@me.com

**EXHIBIT "A"**

https://www.tattnallcountyga.com/board-of-commissioners.cfm



# Board of Commissioners

Tattnall County is divided into five districts and the five members of the board of commissioners are elected by district for four-year terms. The chairman is elected at large every four years.

The Board appoints the County Manager and County Attorney. The County Manager hires directors for the departments under the Board's jurisdiction. As part of general county operations, the BOC must finance county programs and pay the salaries of constitutional officers.

The board of commissioners meets regularly on the first Monday of each month at 9 a.m.. Commission work-sessions are scheduled one week prior to the regular meetings. Special meetings are called when necessary. The public is invited to attend these meetings.

Georgia county commissioners affect the lives of residents more directly -- and more often -- than the governor, state senators and representatives, judges, mayors, the sheriff or their employers.

The general duties of the Commissioners are:

- To enact resolutions and ordinances for the general health, safety and welfare of the residents of Tattnall County.
- To levy taxation when necessary to finance the operation of the county government.
- To approve an annual budget of revenues and expenditures.
- To maintain County infrastructure and buildings.
- To plan for future public service needs.

- To provide necessary services to safeguard the well-being and safety of the residents.

County commissioners have authority over the construction and maintenance of local roads, election facilities and equipment, parks and recreational facilities. The Board of Commissioners directs the provision of fire services, emergency preparedness, emergency medical services and rescue units, should you ever need them.

Counties were created by a rural society that looked to government to keep the records straight and the justice swift. The state constitution originally created four elected county officers: the sheriff, the tax commissioner, the clerk of the superior court, and the judge of the probate court, but in 1868 the state began creating the position of county commissioner to administer the general operations of the county.

Originally every county had one commissioner, but over the years those positions have been replaced by boards of commissioners. Eight counties in Georgia still have sole commissioners and Georgia is the only state in the country with that form of local government. Tattnall County is not one of them.

Commissioners

108 West Brazell Street
P.O. Box 25
Reidsville, GA 30453-0025
912-557-4335

**Jackie C. Trim**
Chairman

**Ricky C. Jarriel**
District 1
**Bobby Kennedy**
District 2
**G.W. Thompson**
District 3
**Wayne Tatum**
District 4
**William J. (Bill) Kicklighter**
District 5

**EXHIBIT "B"**

https://www.tattnallcountyga.com/emergency-medical-service.cfm



# Emergency Medical Service

Tattnall County EMS is licensed by the Georgia Department of Human Resources and provides primary 911 EMS service to 26,000 local residents spread over 488 square miles. EMS personnel provide service to residents of five municipalities in the county and mutual aid service to surrounding counties. In addition to emergency coverage, Tattnall County EMS provides coverage for many venues needing an ambulance present during special events.

The Paramedics and EMTs work closely with first responders from the sheriff's office as well as fire and police departments from each community. Each ambulance carries Basic Life Support (BLS) medical supplies, including glucometers, pulse oximetry, intranasal naloxone administration, splints, bandages, oxygen tanks and masks, and spinal immobilization equipment.

Tattnall EMS transports patients when needed to area facilities including the Optim Medical Center-Tattnall, Memorial University Hospital in Savannah, Southeast Georgia Regional Medical Center in Statesboro and the Joseph M. Still Burn Center in Augusta.

Advanced Life Support care requires medical monitoring and care by a licensed Paramedic/EMT and may include monitoring vital signs, advanced drug therapy, cardiac monitoring, oxygen and IV therapy. The ALS Ambulance is equipped with state-of-the-art heart and blood pressure monitoring equipment, pulse oximetry, IV pumps, oxygen delivery devices including a CPAP and advanced medications used to treat a variety of illnesses and provide pain relief.

Dial 911 for all emergencies and 912-557-3640 for non-emergencies. Emergency calls are dispatched by the men and women of the Tattnall County 911 Center.

EXHIBIT "C"

3/9/2021

optim primary care

125 Memorial Drive
Reidsville, GA 30453

RE: Paul Adams
DOB: 03/27/58

To Whom It May Concern,

Mr. Adams presented to our office on 01/25/21 for a hospital followup from being evaluated at MRMC in Vidalia and diagnosed with early pneumonia related to COVID 19. Mr. Adams was complaining of increasing shortness of breath especially with ambulation. Oxygen saturation dropped from 93% to 87% while on 4 Liter nasal cannula while ambulating to the exam room. Patient was giving an albuterol nebulizer treatment in the office which increased his oxygen level to 90% Patient was instructed to go get an updated chest x ray at Optim healthcare and then went home. The chest x ray results showed worsening pneumonia and the patient needed to be evaluated again in the hospital setting. At that time, I called Meadows Regional Medical Center, Candler Hospital, and East Georgia Regional Medical Center to inquire about patient bed availabilty and was told they were full and if he presented to their ER he would probably be shipped out of state for care. I then called Memorial Medical Center in Savannah to inquire about bed availability and was instructed to have the patient present to the Memorial ER for treatment and they would do there best to admit him there if needed. Mr. Adams' spouse Chris Adams was notifed with the results that the pneumonia had worsened. Mrs. Adams stated the patient was still very short of breath, nauseated, and having pain. His oxygen tank supply was getting low. She stated he looked very pale and I explained to her that he needed to be in a hospital setting for the treatment of his pneumonia and Memorial Medical Center knew he was coming to be evaluated. I instructed her to call the EMS for evaluation and for the immediate need for an oxygen tank due to hypoxemia.

Please feel free to contact me with any questions or concerns,

Sherry May, NP-C          3/9/21

**EFILED IN OFFICE**
CLERK OF STATE COURT
TATTNALL COUNTY, GEORGIA

**STSV2022000013**
**HM**

FEB 16, 2022 12:44 PM

*Paige D. Mulligan*
Paige D. Mulligan, Clerk
Tattnall County, Georgia

**IN THE STATE COURT OF TATTNALL COUNTY**

**STATE OF GEORGIA**

| | |
|---|---|
| PAUL ADAMS and CHRISTINE ADAMS, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>TATTNALL COUNTY; JOHN DOE #1; )<br>JOHN DOE #2; and JOHN DOE #3, )<br>)<br>Defendants. ) | CIVIL ACTION<br><br>FILE NO.:_____ |

### PLAINTIFFS' FIRST REQUESTS
### FOR ADMISSION TO DEFENDANTS

COME NOW the Plaintiffs and require Defendants to answer under oath the following Requests For Admission within forty-five (45) days from the date of service of these Requests, pursuant to O.C.G.A. §9-11-36(a)(2), and a copy of the answers to be furnished to Plaintiffs' attorney.

**NOTE A:** In reply to these Requests For Admission, your answer should specifically admit or deny the request, or set forth in detail the reasons why the request cannot be truthfully admitted or denied. Any denial shall fail to meet the substance of the requested admission, and when good faith requires that you qualify your answer or deny only a part of the matter of which an admission is requested, you shall specify so much of it as is true and qualify or deny the remainder. O.C.G.A. §9-11-36(a)(2).

**NOTE B:** As the answering party, you may not give lack of information or knowledge as a reason for failure to admit or deny unless reasonable effort has been made and the information known or readily obtainable and available is sufficient to enable one to admit or deny the matter. O.C.G.A. §9-11-36(a)(2).

**NOTE C:** If Defendants consider that a matter requested presents a genuine issue for trial, this alone does not constitute grounds for an objection. Mixed questions of law and fact, opinions, and genuineness of documents are all legitimate subjects of Requests For Admission. O.C.G.A. §9-11-36(a)(1)(2).

### DEFINITIONS

As used herein, the terms listed below are defined as follows:

1.  "**Person**" means any natural person, corporation, partnership, proprietorship, association, organization, group of persons, or any governmental body or subdivision thereof.

2.  "**Subject Incident**" means the incident which occurred at the residence of the Plaintiffs on January 25, 2021 in Tattnall County, Georgia.

3.  "**You**" or "**Your**" means Defendants.

4.  "**EMS**" means Emergency Medical Services.

## REQUESTS FOR ADMISSION

### 1.

Admit that Tattnall County operates a 911 system and provides emergency medical services ("EMS") and ambulance transport.

### 2.

Admit that Tattnall County was properly named in this case and provided with notice of Plaintiffs' claims within one year of the subject incident.

### 3.

Admit that after a 911 call, Defendants sent an ambulance and two ambulance personnel to the Plaintiffs' residence on January 25, 2021.

### 4.

Admit that ambulance personnel told Mrs. Adams they would not take her husband in the ambulance and refused to enter the Plaintiffs' home for 35-45 minutes after their arrival.

### 5.

Admit that jurisdiction is proper in this Court as to you.

### 6.

Admit that ambulance personnel only wanted Mrs. Adams to sign a paper while they were outside the Adams' home.

### 7.

Admit that only after the paper was signed by Mrs. Adams did an ambulance personnel enter the home and helped Mr. Adams sit up in his bed.

### 8.

Admit that Defendants told Mrs. Adams she would have to take her husband to the hospital in her own car.

9.

Admit that ambulance personnel did not assist Mr. Adams in getting to his car.

10.

Admit that Mrs. Adams was upset and crying and told ambulance personnel her husband was very ill and needed to get to a hospital right away.

11.

Admit that despite the multiple requests and pleas by Mrs. Adams, emergency medical services and emergency ambulance transport was refused.

12.

Admit that Mr. Adams is a disabled individual and has been found to be disabled since 2002 by the United States Social Security Administration.

13.

Admit you provide county-wide EMS and ambulance transportation.

14.

Admit that in January 2021, Tattnall County's EMS website stated ambulances with life support equipment provide emergency transport to Memorial Hospital in Savannah, Georgia.

15.

Admit that at the time of the subject incident, you refused ambulance transport for Mr. Adams to go to Memorial Hospital in Savannah, Georgia, and also refused to provide Mr. Adams with emergency medical evaluation and life support emergency care.

16.

Admit that Mrs. Adams requested emergency care and ambulance transport to Memorial Hospital for her husband.

17.

Admit that Plaintiffs did not prevent the ambulance from taking Mr. Adams to Memorial Hospital.

18.

Admit that the ambulance and its personnel sat at the Adams' residence for approximately 45 minutes, all the while refusing ambulance transport.

19.

Admit ambulance personnel told Mrs. Adams they had recently taken other ill individuals to hospitals as far away as Florida.

3

20.

Admit that upon their arrival, ambulance personnel told Mrs. Adams they would not go inside the Adams' home.

21.

Admit that ambulance personnel told Mrs. Adams she would have to get her husband out of the bed and get him to the family car.

22.

Admit that only after a county paper was signed and Mrs. Adams told personnel she could not get her husband out of bed, that ambulance personnel then entered the residence.

23.

Admit that ambulance personnel told Mrs. Adams if there was medical trouble with her husband while Mrs. Adams was driving him to the hospital, that she should call another 911 emergency system.

24.

Admit that Defendants' actions constituting the subject incident were done with want of care and a conscious indifference to the health consequences for Mr. Adams.

25.

Admit that Defendants' actions constituting the subject incident were based on an actual intention to harm the medical condition of Mr. Adams.

26.

Admit that Defendants' failure to evaluate, treat, and provide life support ambulance transport to the hospital proximately caused the aggravation of Mr. Adams' medical condition.

27.

Admit that Defendants' actions constituting the subject incident resulted in severe emotional distress to the Plaintiffs.

28.

Admit that O.C.G.A. §31-11-82 requires emergency medical providers to evaluate an emergency medical condition once a person has been presented to them.

29.

Admit that Defendants did not evaluate Mr. Adams' medical condition in violation of O.C.G.A. §31-11-82.

4

30.

Admit that emergency medical providers are defined in O.C.G.A. §31-11-81 as any provider of emergency medical transportation licensed or permitted by the Department of Public Health.

31.

Admit that at the time of the subject incident Tattnall County sent emergency medical providers and emergency medical transportation to the Plaintiffs' residence.

32.

Admit that Georgia's statutes and Georgia's EMS Administrative Code Rules set forth ministerial duties which must be followed by Tattnall County's EMS personnel.

33.

Admit that in violation of EMS Rule 511-9-2-.18, Mr. Adams' life was endangered by Tattnall County's ambulance personnel.

34.

Admit that in violation of EMS Rule 511-9-2-.18, Mr. Adams was mistreated and abandoned by Defendants.

35.

Admit that EMS Rule 51-9-2-.09(6)(d) requires sufficient licensed personnel to be immediately available to respond with at least one registered medical first responder vehicle and, if they are not available, they shall request mutual aid assistance and, if mutual aid is not available, the provider shall respond with its next available registered vehicle.

36.

Admit that Defendants violated EMS Rule 51-9-2-.09(6)(d).

37.

Admit that EMS Rule 511-9-2-.07(6) was violated by Defendants which requires emergency transport to the patient's chosen hospital.

38.

Admit that Defendants knew Mrs. Adams would have to drive her own car over sixty (60) miles to get her husband to Memorial Hospital in Savannah, Georgia.

39.

Admit that Defendants have a duty to the public to provide emergency medical personnel duly licensed, and emergency medical personnel who follow state laws and state EMS Rules.

40.

Admit that the federal American With Disabilities Act applies to Tattnall County's programs and services, including 911 services, EMS operations, and EMS employees or EMS contractors.

41.

Admit that Mr. Adams is, and was at the time of the subject incident, a disabled individual and has been found to be disabled by the United States Social Security Administration.

42.

Admit that ambulance personnel knew Mr. Adams was inside the home with a disability, including an emergency medical condition, yet no personnel went inside the home until a paper was signed by Mrs. Adams approximately 35-45 minutes later.

43.

Admit that Defendants intentionally discriminated against Mr. Adams who is, and was at the time of the subject incident, a disabled individual.

44.

Admit that Defendants do not have immunity from legal claims based upon the Americans With Disabilities Act, 42 USC 12101 et seq.

45.

Admit that Defendants do not immunity from legal claims based upon Defendants' negligent breach of ministerial acts.

46.

Admit that Defendants are required to follow state laws and state EMS Rules, which are clear, definite, and certain, so that they merely require the execution of relatively simple, specific duties.

47.

Admit that the events constituting the subject incident included some discretionary acts which were done by Defendants with the intent to cause injury or with a reckless disregard for human life.

48.

Admit that Defendants are required to perform discretionary acts with no intent to cause injury and with no reckless disregard for human life.

49.

Admit that the protections provided under O.C.G.A. §46-5-131(a) do not apply to the Defendants' conduct surrounding the subject incident on January 25, 2021.

_____

VILLARD BASTIEN
Attorney for Plaintiffs
Ga. Bar No.  100176

200 Ashford Center North
Suite 215
Atlanta, Georgia  30338
(404) 378-4344
(470) 275-3906 fax
vbastien@me.com

**IN THE STATE COURT OF TATTNALL COUNTY**

**STATE OF GEORGIA**

⊕ EFILED IN OFFICE
CLERK OF STATE COURT
TATTNALL COUNTY, GEORGIA

**STSV2022000013**
**HM**
FEB 16, 2022 12:44 PM

*Paige D. Mulligan*
Paige D. Mulligan, Clerk
Tattnall County, Georgia

| | |
|---|---|
| PAUL ADAMS and CHRISTINE ADAMS, ) | |
| ) | |
| Plaintiffs, ) | CIVIL ACTION |
| v. ) | |
| ) | FILE NO.:_____ |
| TATTNALL COUNTY; JOHN DOE #1; ) | |
| JOHN DOE #2; and JOHN DOE #3, ) | |
| ) | |
| Defendants. ) | |

### PLAINTIFFS' FIRST CONTINUING
### INTERROGATORIES TO DEFENDANTS

COME NOW the Plaintiffs and serve these Interrogatories upon Defendants and request that they be answered fully in writing and under oath within forty-five (45) days from the date of service thereof, all in accordance with O.C.G.A. §9-11-33.

Each Interrogatory is addressed to the personal knowledge of Defendants, as well as to the knowledge and information of Defendants' attorneys, agents, and other representatives. When a question is directed to a Defendant, the question is also directed to each of the aforementioned persons.

These Interrogatories are deemed to be continuing so as to require supplemental answers if the Defendants to whom these Interrogatories are addressed obtain further or different information between the time answers are served and the time of trial, as required by law.

### Definitions

As used herein, the terms listed below are defined as follows:

1. "Document" means every writing or record of every type and description that is or has been in your possession, custody, or control or of which you have knowledge, including, but not limited to, correspondence, memoranda, tapes, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, drawings and photographs, films, microfilms, voice recordings, maps, reports, surveys, minutes, or statisform, including copies, drafts, and reproductions. "Document" also refers to any other data, compilations from which information can be obtained, and translated, if necessary, by you through computer or detection devices into reasonably usable form.

2.    "Person" means any natural person, corporation, partnership, proprietorship, association, governmental entity, agency, group, organization, or group of persons.

3.    "This occurrence" and "the incidents" and "claims" and "occurrence and claims" means the events surrounding the refusal of emergency medical services ("EMS") for the benefit of the Plaintiffs which occurred at the residence of the Plaintiffs in Reidsville, Georgia, on January 25, 2021 and which is the subject matter of this lawsuit.

4.    To "identify" a "document" means to provide the following information irrespective of whether the document is deemed privileged or subject to any claim of privilege: (a) the title or other means of identification of each such document; (b) the type of document (*e.g.*, letter, memorandum, record); (c) the date of each such documents; (d) the author of each such document; and (e) the recipient or recipients of each such document, including but not limited to Defendant or any who purports to represent Defendant; (f) the present location of any and all copies of each such document in the care, custody or control of Defendant; (g) the names and current addresses of any and all persons who have custody or control of each such document or copies thereof; and (h) if all copies of the documents have been destroyed, the names and current addresses of the person or persons authorizing the destruction of the document and the date the document was destroyed.

In lieu of "identifying" any document, it shall be deemed a sufficient compliance with these interrogatories to attach a copy of each such document to the answers hereto and reference said document to the particular interrogatory to which the document is responsive.

5.    To "identify" a natural person means to state that person's full name, title or affiliation, home address, business address and/or last known address, all telephone numbers, occupation, date of birth, and social security number.

6.    To "identify" a person which is a business, organization or group of persons means to state the full name of such business, organization, or group of persons, the form of the business, organization or group of persons (e.g., government agency, corporation, partnership, joint venture, etc.).

7.    "You", or "your" refers to, without limitation, the named Defendants, and all entities with which they are or have been employed and/or affiliated, together with any predecessor, successor, parent, or subsidiary entity as well as any board, commissioner, commission, officer, director, employee, attorney, agent, or represent of Defendants or any entity previously described herein.

8.    "Complaint" refers to the Complaint filed by Plaintiffs in this action.

9.    Terms in the singular shall be deemed to include the plural and terms in the plural shall be deemed to include the singular.

2

10. Use of feminine pronouns shall be deemed to include the masculine and neuter and use of masculine pronouns shall de deemed to include the feminine and neuter.

Please respond to the following Interrogatories:

1.

Please identify the person or persons responding to these Interrogatories on behalf of the Defendants, as well as identify in your answer each person who has provided information in connection with each interrogatory answer.

2.

For a Defendant which is not a natural person, please identify your correct legal entity and identify all boards, commissions, commissioners, directors, and other parties with any authority over or interest in your entity. Also please identify the persons which supervised, managed, and trained the employees and/or contractors who received the relevant 911 call, dispatched an ambulance, and who were at the residence of the Plaintiffs on January 25, 2021.

3.

Identify and describe in detail the Defendants' instructions, protocols, and policy or policies for answering 911 calls, dispatching emergency vehicles, and the provision of emergency medical services ("EMS").

4.

Identify those person(s) who are the decision makers concerning the provision of or refusal of EMS within Tattnall County, Georgia, together with the identity of the person or persons who decided to refuse EMS emergency care and emergency transport at Plaintiffs' residence on January 25, 2021.

5.

Please state in detail your version of how the occurrence complained of in the Complaint took place, including any and all persons(s) who decided to refuse EMS to the Plaintiffs, and who made the decision(s) to have a county ambulance arrive at Plaintiffs' residence, but refuse EMS care and transport.

6.

Is it Tattnall County's public policy to instruct residents to call 911 in the event of a medical emergency?

7.

At the relevant time, did Tattnall County's EMS website page instruct the public to "Dial 911 for all emergencies"?

3

8.

At the relevant time, did Tattnall County's public safety website page instruct residents in bold red lettering, as follows: IN CASE OF EMERGENCY ALWAYS DIAL 911?

9.

Identify the ambulance and the ambulance personnel who were dispatched to the Plaintiffs' residence on January 25, 2021, including the location of the ambulance prior to being dispatched to the Plaintiff's residence.

10.

Identify the employment history, the employment status, the training, and the certifications of Defendants' personnel who received the 911 call from Plaintiffs' residence; the personnel who decided to send an ambulance to the residence; and, the personnel who decided to refuse ambulance transport and emergency medical care.

11.

State in detail who, how, when, where, and why personnel decided to send an ambulance to the Plaintiffs' residence.

12.

How many ambulances does Tattnall County have and where are they located when not in use?

13.

At the relevant time, where were Tattnall County's other ambulances, besides the ambulance which was dispatched to the Plaintiffs' home?

14.

Identify any previous or subsequent occurrence(s) of which you are aware that occurred in substantially the same manner as the occurrences complained of in this lawsuit over the last ten (10) years through to the present date, including, but not limited to, refusing county ambulance and/or EMS assistance.

15.

Do you contend that any person or entity other than you and/or your employees, agents, apparent agents, ostensible agents, contractors and/or servants, were responsible for the aggravation of the Plaintiff Paul Adams' medical condition and intentional infliction of emotional distress? If so, state each and every fact on which you base your contention, and identify each and every person and writing that supports that contention.

4

16.

Who instructed the ambulance personnel to take a county ambulance to the Plaintiffs' residence, but not provide EMS care or transport, or did the ambulance personnel themselves make the decision not to provide EMS care and transport?

17.

Please identify each person whom you expect to call as a witness and expert witness; the witness and expert's subject matter; the facts and opinions about which the witness and expert is expected to testify; a summary of the grounds for each fact or opinion, identifying any materials provided by you or your attorneys to the witness and experts(s); and provide a complete list of all case matters, including the complete style of the case, in which you or your attorneys have previously used said witness and expert(s).

18.

Identify all persons known to you, your attorney, or your insurance carrier(s) who have any relevant knowledge concerning the occurrences and claims set forth in the Complaint, designating which of these persons, if any, are expert witnesses and/or eyewitnesses, and a general summary of their knowledge.  Include information about, but such information is not limited to, identifying eyewitnesses, people claiming to be eyewitnesses, and persons with whom communications and conversations were held concerning the incidents and occurrence(s) which are the subject of this lawsuit.

19.

State whether you have been involved in any lawsuit or claim of a same or similar nature to the occurrences and claims set forth in the Complaint, either prior to or subsequent to these occurrences; and, if so, state the nature of each lawsuit or claim, the name and last known address of the parties to said lawsuit or claim, the court where said lawsuit or claim was filed, and the date of said lawsuit or claim.

20.

Identify each and every written report made by any person concerning the incident. State the names, addresses, home telephone numbers, place of employment, job titles or capacities, and present whereabouts of all persons who have knowledge of or have given statements of any type covering the facts and circumstances of the incident, occurrence, and claims which are the subject matter of this litigation, listing for each statement the date of same and form of the statement  (i.e., written, recorded, oral, etc.).

Also, please identify the name, address, and phone number of the custodian of any such statements. For each such individual, identify his/her job title, job function being performed by that individual at the time of these incidents, and the summary of what knowledge the witness has.

21.

Please identify all documents or tangible things, the production of which is requested in Plaintiff's First Request For Production Of Documents And Notice To Produce served concurrently herewith; but, concerning any documents which are not produced and for each such document or thing, provide: a detailed description of the thing or document; the author of the document and his/her address and telephone number; the date the thing or document was created and the name of the persons to whom the document or copies of the thing or document were transmitted; your basis for not producing the thing or document; and a summary statement describing the contents of the thing or document in sufficient detail as to permit the Court to reach a determination in the event of a Motion To Compel.

22.

At the time of the incident and occurrence and claims described in Plaintiffs' Complaint, were you covered by any policy of liability insurance, insurance reciprocal, or self-insurance trust and excess coverage? If your answer is in the affirmative, for each such policy, reciprocal, or trust providing <u>primary</u> or <u>excess</u> coverage, please state the following: the exact name of the insurer, reciprocal, or trust; the name of the named insured or insureds; the policy or certificate number; the effective dates of beginning and end of the coverage; and the exact amount of the coverage.

23.

Has any insurance company, reciprocal, or trust which you believe provides liability or primary or excess coverage to you for the incident(s) and occurrence and claims described in Plaintiff's Complaint denied coverage for Defendants' actions or stated it will defend you in this matter under a reservation of rights to later deny coverage?

24.

As to each of the policies of insurance, reciprocal, or trust mentioned in your answers to these Interrogatories, please state whether there are currently any pending claims that might affect the amount of insurance available to satisfy the claim in this matter. If so, please state whether a lawsuit has been filed, the case caption, and the court wherein such has been filed; and, if no suit has been filed, the name of the attorney, if there is one, representing the claimant.

25.

As to each of the policies of insurance, reciprocal, or trust mentioned in your answers to these Interrogatories, please state whether the amount of insurance available to satisfy the matter is subject to any reduction in applicable aggregate or per-incident limits as a result of any other claims, or for any other reason.

26.

Please state whether or not you contend that the Plaintiffs in any way caused or contributed to the occurrences complained of in the Complaint and, if so, state in detail what facts you rely upon.

27.

Please state whether you contend that any of the damages complained of by the Plaintiffs in the Complaint were not incurred or were not related to the occurrence and, if so, state in detail what facts you rely upon.

28.

Identify any person or party other than the Defendants to this lawsuit whom you contend caused or contributed to the occurrences complained of.  Include in your answer whether you blame Plaintiffs for Plaintiffs' own injuries and emotional distress, together with, if applicable, a detailed description of the alleged Plaintiffs' actions allegedly being the proximate cause of Plaintiffs' injuries and emotional distress.

29.

Describe the Defendants' policy or policies for deciding who will be given or refused to be given ambulance transport and EMS care.

30.

Is it the policy of the Defendants to refuse to enter a residence and require a family member to bring an emergency patient outside the home? Please identify all relevant policies relating to county personnel refusing to enter a residence during an emergency.

31.

Is it the policy of the Defendants to refuse emergency care and transport to a disabled person? Please identify all relevant policies relating to emergency treatment of disabled individuals as so identified in the federal Americans With Disabilities Act.

32.

Please identify any person who is a witness to or involvement in the occurrences complained of and who is known to Defendants.

33.

Do you know of any statement, conversation, comment, testimony, or report made by any party or witness to this lawsuit, including the Plaintiffs, made at the time of the occurrences, or following the occurrences, concerning the occurrences or facts relevant to any issue in this case? If your answer is "yes", state the content of such statement, conversation and/or comments, report, the place(s) where it took place, and the custodian of such statement, together with the identity of such person(s).

34.

If anyone investigated this matter for you, including, but not limited to, private investigators or insurance adjusters, state their name(s) and address(es), and state whether such investigation was reduced to writing, and the substance of their investigation and findings. If said parties obtained any signed, recorded, transcribed, or oral statement from any individual, identify the person who gave the statement and the present custodian of such statement.

35.

Identify each person interviewed concerning the occurrences and claims. For each such person, also state the date of the interview, the substance of the interview, and if the interview was recorded and/or transcribed.

36.

Do you know of any statement, conversation, comment, testimony, or report made by any party or witness to the occurrence and claims, including the Plaintiffs, made at the time of the occurrences, or following the occurrences, concerning the occurrences or facts relevant to any issue in this case? If your answer is "yes", state the content of such statement, conversation and/or comments, report, the place where it took place, and the custodian of such statement.

37.

What is the Defendants' policy or policies regarding a requirement or request for a family member to sign paperwork during the time of a medical emergency?

38.

How long did Defendants' ambulance sit outside the home of the Plaintiffs on January 25, 2021?

39.

Where did the ambulance go after it left the Plaintiffs' home?

40.

How many trips did all of Defendants' ambulances make to Memorial Hospital for the last five years before the date of the incident?

41.

How many trips did all of Defendants' ambulances make to hospitals which were sixty (60) miles or more away from Tattnall County, Georgia during the last five years preceding the date of the incident, and in January 2021?

42.

Why did Defendants' ambulance come to the Plaintiffs' home, but refuse to enter the home?

43.

Why did Defendants' ambulance refuse to evaluate, care for, and transport Mr. Adams?

44.

Why did Defendants arrive at the Plaintiffs' residence, but tell Mrs. Adams no services would be provided and that Mrs. Adams should sign a county paper?

45.

Identify and describe the contents of the paper which Defendants had Mrs. Adams sign on January 25, 2021.

46.

Did Mrs. Adams advise Defendants on the relevant date that her husband was in an emergency medical condition?

47.

Did Mrs. Adams advise Defendants on the relevant date that Mr. Adams' healthcare provider wanted an ambulance to get Mr. Adams to Memorial Hospital as soon as possible?

_____
VILLARD BASTIEN
Attorney for Plaintiffs
Ga. Bar No.  100176

200 Ashford Center North
Suite 215
Atlanta, Georgia  30338
(404) 378-4344
(470) 275-3906 fax
vbastien@me.com

⬧ EFILED IN OFFICE
CLERK OF STATE COURT
TATTNALL COUNTY, GEORGIA

**STSV2022000013**
HM
FEB 16, 2022 12:44 PM

*Paige D. Mulligan*
Paige D. Mulligan, Clerk
Tattnall County, Georgia

**IN THE STATE COURT OF TATTNALL COUNTY**

**STATE OF GEORGIA**

| | | |
|---|---|---|
| PAUL ADAMS and CHRISTINE ADAMS, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| v. | ) | |
| | ) | FILE NO.:_____ |
| TATTNALL COUNTY; JOHN DOE #1; | ) | |
| JOHN DOE #2; and JOHN DOE #3, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND NOTICE TO PRODUCE TO DEFENDANTS

COME NOW the Plaintiffs and hereby request, pursuant to O.C.G.A §9-11-34, that the Defendants produce for inspection and copying at the Law Offices of Villard Bastien, LLC, 200 Ashford Center North, Suite 215, Atlanta, Georgia  30338, on the forty-fifth (45th) day after service of these requests the documents described below that are in the possession, custody, or control of Defendants or their agents or attorneys.

If privilege is claimed as to any documents otherwise covered by this request for production, Plaintiffs request that each document as to which privilege is claimed be identified in a manner such that the Court may determine whether or not such document is entitled to be accorded privileged status.  Specifically, state (a) the document's "sender" and/or author, the recipient, date, type of document (e.g., letter, memorandum, record, etc.) and general subject matter; and (b) the basis upon which you claim the privilege. This request for production seeks inspection and copying of documents in the possession of Defendants and their agents and attorneys, including both copies and originals, unless otherwise specifically stated.

## **Requests**

1.

All documents identified by Defendants in response to Plaintiffs' First Continuing Interrogatories.

2.

All documents consulted, referred to, or otherwise utilized in any way in connection with the preparation of Defendant's responses to Plaintiff's First Continuing Interrogatories.

3.

All correspondence and other documents which evidence, reflect, or relate to any communication between Plaintiffs and Defendants, or Plaintiffs and Defendants' insurance carrier regarding the occurrences and claims arising from the incidents described in the Complaint.

4.

Any document, video, photograph, and drawing which Defendants contend contains relevant information, whether or not in support of any defense asserted by Defendants in this lawsuit.

5.

Any and all documents, video, photograph, and drawing, other than those requested above that reflect, refer, or relate to any of the facts that form the subject matter of this litigation.

6.

Please provide a copy of any insurance policies referred to in your answers to Plaintiff's First Continuing Interrogatories.

7.

Please provide all written reports of each person whom you expect to call as a witness and expert witness at trial.

8.

Please provide all documents upon which any witness and expert witness you intend to call at trial relied upon for factual gatherings and to form an opinion.

9.

Please provide the most recent resume or curriculum vitae of each expert whom you expect to call as an expert witness at trial.

10.

Please provide all notes, correspondence, bills, invoices, diagrams, photographs, x-rays, or other documents prepared or reviewed by each person whom you expect to call as an expert witness at trial.

11.

Please provide all invoices generated by expert witnesses for performing all expert witness services to the Defendants, including, but not limited to, fees for the records review, the pretrial preparation, any telephone conference, any trial testimony anticipated, and any other fee paid by the Defendants for expert fees.

12.

Please provide all written, recorded, or signed statements of any party, including the Plaintiffs, Defendants, witnesses, investigators, agent, representative, or employee of the parties concerning the subject matter of this action.

13.

Please provide all photographs, videotapes, audio tapes, diagrams, records, surveys, or other graphic representations of information concerning the subject matter of this action, the Plaintiffs, and the activities on January 25, 2021.

14.

Please provide all contracts or agreements entered into between the Defendants and any other named Defendants, employees, and contractors who are named in or related to this civil action.

15.

Please provide any documents which afforded liability insurance for the incident which is the subject matter of the Plaintiffs' Complaint.

16.

Please provide any documents identified in any other parties' answers to Plaintiff's First Continuing Interrogatories or documents received pursuant to a subpoena request.

17.

Please provide copies of state and local laws, rules, regulations, protocols, policies, handbooks, training materials, standards of conduct, legal authorities, or codes which were in effect and which governed the actions of Defendants on January 25, 2021.

18.

Please provide copies of any policies, handbooks, protocols, training materials, human resources materials, treatises, standards in the industry, legal authority, rule, case, statute, or code that will be relied upon or which relate to the defense of this case.

19.

Please provide copies of prior similar incidents in Tattnall County, or similar incidents involving employees or contractors, which are the subject of this lawsuit.

20.

Please provide copies of the entire employment and contractor files for each person working at or performing managerial and/or supervisory duties at or concerning EMS and ambulance transport in January 2021; including, without limitation, drug and alcohol tests, applications for employment, employment histories, dates of employment and shifts worked, questionnaires, criminal backgrounds, training materials and training procedures, job descriptions, counselling, awards, citations, warnings, punishments, disciplinary actions, commendations, and job reviews.

21.

Please provide copies of all statements, reports, moving pictures, motion pictures, videos, photographs, photographic renderings, CDs, and drawings which relate to the subject of this lawsuit; including, without limitation, security videotapes or videos, CDs, still photography, drawings, written statements, transcripts of oral statements, and insurance adjustor reports/statements.

22.

Please provide copies of any and all documents relating to the operation of, and contractors or employees employed at or for the benefit of, the Defendants, including, without limitation, managerial and employee handbooks, videos, CDs, websites, policy and procedure manuals; including, without limitation, training information for all paramedics, emergency medical technicians, ambulance personnel, supervisors and employees; and policies/procedures outlining the manner in which complaints against Defendants and employees are addressed; and all tangible or internet information relating to the manner in which Defendants and contractors or employees are required to behave, or instructed to behave, provide services, and interact with the public.

23.

Please provide copies of all communications or notations, or anything of any tangible nature, concerning communications relating to Plaintiffs' incident to include paper, electronic, texting, or any other form of communication whatsoever.

24.

Please provide copies or summaries of all communications between Defendants and any party relating to the occurrences and claims set forth in the Complaint.

25.

Please provide county 911 call receipt and dispatch records for the month of January 2021, and 911 call voice recordings, including, but not limited to, a list of all 911 calls, reporting party, telephone number, date, time, location, contact number, CAD Event (code pertaining to the nature of the problem), Computer-Aided Dispatch Report, summary of a 911 incident which includes date, time, location, CAD Event (code pertaining to the nature of the problem), narrative information, public safety (law, fire, and/or EMS) response and associated timeline, audio files (an audio recording of the 911 incident - law, fire, and/or EMS).

26.

Please provide county ambulance documentation, including EMS notes, personnel notes, patient notes, call receipt, dispatch records, and reports for the month of January 2021.

27.

Please provide a copy of the paper which Mrs. Adams signed on January 25, 2021 after being told she had to sign this paper furnished by ambulance personnel.

28.

Please provide other relevant public records relating to the incident complained of in the Complaint.

29.

Please provide county policies, procedures, protocols, industry standards, state laws, or state regulations authorizing Defendants' ambulance to arrive at a residence, but then refuse medical evaluation and ambulance transport which has been requested.

30.

Please provide county policies, procedures, industry standards, or protocols recognizing that Defendants must adhere to the federal Americans With Disabilities Act while providing county services and programs.

_____

VILLARD BASTIEN
Attorney for Plaintiffs
Ga. Bar No.  100176

200 Ashford Center North
Suite 215
Atlanta, Georgia  30338
(404) 378-4344
(470) 275-3906 fax
vbastien@me.com

# STATE COURT OF TATTNALL COUNTY
# STATE OF GEORGIA

⊛ EFILED IN OFFICE
CLERK OF STATE COURT
TATTNALL COUNTY, GEORGIA

**STSV2022000013**
HM
**FEB 16, 2022 12:44 PM**



Paige D. Mulligan, Clerk
Tattnall County, Georgia

CIVIL ACTION NUMBER  <u>STSV2022000013</u>

ADAMS, PAUL
ADAMS, CHRISTINE

---

**PLAINTIFF**

**VS.**

TATTNALL COUNTY
DOE #1, JOHN
DOE #2, JOHN
DOE #3, JOHN

---

**DEFENDANTS**

## SUMMONS

TO: TATTNALL COUNTY

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

> **Villard Bastien**
> **Law Offices of Villard Bastien, LLC**
> **200 Ashford Center North**
> **Suite 215**
> **Atlanta, Georgia 30338**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 16th day of February, 2022.**

Clerk of State Court

*Paige D. Mulligan*

Paige D. Mulligan, Clerk
Tattnall County, Georgia

Page 1 of 1

**General Civil and Domestic Relations Case Filing Information Form**

**EFILED IN OFFICE**
CLERK OF STATE COURT
TATTNALL COUNTY, GEORGIA

**STSV2022000013**

**FEB 16, 2022 12:44 PM**

*Paige D. Mulligan*
Paige D. Mulligan, Clerk
Tattnall County, Georgia

HM

☐ **Superior** or ☑ **State Court of** _Tattnall_ _____ **County**

| For Clerk Use Only | |
|---|---|
| **Date Filed** 02-16-2022 | **Case Number** STSV2022000013 |
| **MM-DD-YYYY** | |

| **Plaintiff(s)** | **Defendant(s)** |
|---|---|
| ADAMS, PAUL | TATTNALL COUNTY |
| Last    First    Middle I.    Suffix    Prefix | Last    First    Middle I.    Suffix    Prefix |
| ADAMS, CHRISTINE | DOE #1, JOHN |
| Last    First    Middle I.    Suffix    Prefix | Last    First    Middle I.    Suffix    Prefix |
| | DOE #2, JOHN |
| Last    First    Middle I.    Suffix    Prefix | Last    First    Middle I.    Suffix    Prefix |
| | DOE #3, JOHN |
| Last    First    Middle I.    Suffix    Prefix | Last    First    Middle I.    Suffix    Prefix |

**Plaintiff's Attorney** Bastien, Villard _____    **Bar Number** 100176 _____    **Self-Represented** ☐

**Check one case type and, if applicable, one sub-type in one box.**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contract
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☑ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____    _____
**Case Number**    **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____
**Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

_____
_____

Version 1.1.20

TATTNALL COUNTY
CLERK OF SUPERIOR

RECEIPT NUMBER: 168338      2/16/2022
                            14:55

NAME: PEACHCOURT

TRANSACTION TYPE      R/C      AMOUNT

         GENERAL FUND (1)

                      R      $211.00
CIVIL FILING FEES-STATE
    ST-2022-SV-13-PL-1-PEACHCOURT


         TOTAL DUE:          $211.00

| CHECK# | AMOUNT |
|---|---|
| -1 | $211.00 |
| TOTAL PAYMENT: | $211.00 |

         BALANCE:            $0.00

OP:  GENA HUTCHESON

SHERIFF'S ENTRY OF SERVICE                          SC-85-2

Civil Action No. __STSV2022000013__

Date Filed _____02/16/2022_____

Superior Court ☐
State Court ☒
Juvenile Court ☐
Magistrate Court ☐
Probate Court ☐

Georgia, ____TATTNALL_____ COUNTY

__PAUL ADAMS and CHRISTINE ADAMS__

Attorney's Address
Law Offices of Villard Bastien, LLC
200 Ashford Center North
Suite 215
Atlanta, Georgia 30338

Plaintiff

VS.

Name and Address of Party to be Served.

__TATTNALL COUNTY; JOHN DOE #1;__

__JOHN DOE #2; and JOHN DOE #3__

__TATTNALL COUNTY__
__c/o Jackie C. Trim, Chairman of__
__the Board of Commissioners__
__108 West Brazell Street__
__Reidsville, GA  30453__

Defendant

SHERIFF'S ENTRY OF SERVICE

**PERSONAL** ☐
I have this day served the defendant _____
of the within action and summons.

**NOTORIOUS** ☐
I have this day served the defendant _____
copy of the action and summons at his most notorious place of abode in this County.

Delivered same into hands of _____ described as follows:
age, about _____ years; weight _____ pounds; height, about _____ feet and _____ inches, domiciled at the residence of
defendant.

**CORPORATION** ☐
Served the defendant ___TATTNALL County Commissioners_____ a corporation
by leaving a copy of the within action and summons with ___Sheila M. Mills___
in charge of the office and place of doing business of said Corporation in this County.
- Sheila R. Mills

**TACK & MAIL** ☐
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST** ☐
Diligent search made and defendant _____
not to be found in the jurisdiction of this Court.

This __23rd__ day of __Feb__, 20 __22__.

DEPUTY

SHERIFF DOCKET_____ PAGE _____

WHITE-CLERK   CANARY-PLAINTIFF   PINK-DEFENDANT